## Denro Corporation v. Zoning Board of Adjustment

*Michael H. Egnal, Egnal, Simon & Egnal,* and *Fineman & Fineman,* for appellant.

*Frank J. Pfizenmayer, Raymond Kitty, Matthew W. Bullock, Jr.,* and *Edward G. Bauer, Jr.,* for respondent.

SPORKIN, J., October 10, 1968.—This case comes before the court on appeal of Denro Corporation (plaintiff) from the refusal of the Zoning Board of Adjustment (board) to grant a permit for the construction of a grocery at 1342 Cottman Avenue in Philadelphia.

The property is presently a detached, single-family dwelling, but is situated on a heavily traveled main traffic artery which for long stretches is largely or entirely commercial. Plaintiff operates a chain of convenience grocery stores, and proposes to demolish the existing dwelling and erect a one-story self-service store of moderate size to accommodate the neighborhood. Such a use would be allowed as a matter of right

in a "C-2" commercial district, and much of the adjacent area is so zoned. The specific location, however, is zoned "R-5" residential, and the proposed use at that site requires a variance.

The board held a public hearing January 25, 1968, at which two neighbors opposed plaintiff's application. The board denied the application, and this appeal followed.*

A court may not upset the board's decision unless the court finds in the board's action either a manifest abuse of discretion or an error of law: Coleman v. Zoning Board of Adjustment, 413 Pa. 103 (1964). Thus, it is incumbent on the court to examine into the facts on which the board acted. No additional testimony was produced before the court and the court's review is, therefore, confined to the record made before the board.

Cottman Avenue, at the pertinent point, is part of State Route 73, which to the west runs through Montgomery County and to the east through northeast Philadelphia, leading to the Tacony-Palmyra Bridge across the Delaware River and connecting with Route 73 in New Jersey. It is a main highway, popular with residents of northern Philadelphia and the adjoining suburbs motoring to New Jersey seashore resorts. Driving east from Cheltenham in Montgomery County, the traveler sees first a long stretch of commercial enterprises: a lumber yard, a supermarket, many stores, virtually no houses. Entering Philadelphia, and reaching Oxford Avenue, he begins to see scattered groups of homes interspersed with stores, professional offices, churches and gasoline stations.

In the 1200 block of Cottman Avenue, on the south side, which is zoned "R-5" residential and in part "C-2" commercial, are five homes, a gasoline station and five stores, one existing by a variance.

---

* The appeal was defended by the City of Philadelphia and not by the protesting neighbors.

The 1300 block of Cottman Avenue is marked by the same anomalous zoning, "R-5" residential on the south side and a combination of that zoning with "C-2" commercial on the north. The south side of the 1300 block, in which lies the property involved here, contains eight residences, another with a garage for storing construction equipment, a dental office, and, as a result of variances, a garage and a taproom. On the north side are 10 homes, a school, a church, two real estate offices and three shops, four variances having been granted on this side of the block.

The subject property, in a half block between Montour and Whitaker Streets, lies near the end of a small residential oasis on the south side. Crossing Whitaker Avenue and proceeding east into the 1400 block, the traveler immediately sees on the south a large recreation center, running the length of the block, and on the north, zoned "R-5" residential, seven homes, a retail garden supply store and a gasoline station. Continuing east, the traveler finds a spacious automobile agency on the south side, and a mixture of homes and commercial enterprises on the north side. The zoning is "R-5" and "C-2" on the south side and "R-9" on the north side. In sum, of 219 properties from 1000 to 1549 Cottman Avenue, 136 are residences and 83 are commercial structures.

Still traveling east, the traveler passes a fire house, schools, stores and restaurants, and on reaching Castor Avenue enters a long stretch of big department stores, shopping centers and smaller stores. The commercial vista is then unrelieved for perhaps a mile. Not until he crosses Roosevelt Boulevard does the traveler encounter homes again, which homes are interspersed with business enterprises. When the traveler approaches Frankford Avenue, he enters another busy commercial area.

A visual inspection of the long stretch just described impresses an observant traveler overwhelmingly with its predominantly commercial cast, and the strong feeling that it will be only a matter of time before the entire highway for long stretches east and west of the subject site will be exclusively devoted to business uses. The testimony presented before the zoning board bears out such conclusion.

In plaintiff's behalf, a real estate broker operating in the neighborhood testified that he had listed the subject property for sale for three months during 1967 under a residential classification, and that the only inquiries elicited were from people interested in commercial possibilities. Another broker testified that the last residential construction in the area took place about 35 years ago, and that the trend of the entire area is definitely commercial.

The two neighbors who protested said that the proposed commercial use would depreciate the "beautiful" homes in the area, would increase traffic, and would endanger pedestrians on an already congested highway. However, the record shows that throughout the day and night automobile and truck traffic now roars past the homes still remaining in the area at the rate of 24,000 in 24 hours, or an average of 1,000 an hour, reaching 3,000 and 4,000 in peak hours, or one every second. This was corroborated by one of the neighbors, who said, "We who live there have difficulty all the time, . . . All you can hear is brakes and tires squealing".

There was also testimony that within recent times a house across the street had been sold as a residence. It appears further that in June 1966, a bill introduced into city council to change the pertinent zoning to "C-2" commercial failed of passage, and that in the city's comprehensive plan the area is classified as residential.

In approaching the problem in this case, the court must bear in mind the basic right of an owner of property to use it for any purpose he wishes, provided that he does not infringe upon the rights of his neighbors, and that a municipality may not, under the guise of zoning, arbitrarily or unreasonably interfere with such right: White's Appeal, 287 Pa. 259 (1926). The United States Supreme Court has confirmed this principle: Nectow v. City of Cambridge, 277 U. S. 183 (1928).

The Fourteenth Amendment to the Federal Constitution guarantees such right: "No State shall . . . deprive any person of . . . property, without due process of law". The Pennsylvania Constitution, in article I, sec. I, reaffirms the ownership of property as one of the natural rights of mankind: "All men . . . have certain inherent and indefeasible rights, among which are those of . . . acquiring, possessing and protecting property . . ."

It is true, of course, that plaintiff in this case purchased the property with knowledge of its residential character, and that, in a sense, the hardship upon him is self-imposed. Two circumstances answer that contention. First, the fundamental right to use one's property as one sees fit belongs to a man who acquires a property as well as to the man who already owns it. The second answer is that in the case at bar, if it is not feasible to sell the site in question for residential purpose, it is the seller from whom plaintiff is buying the site who would be penalized.

It is clear beyond dispute that to sell the specific site for residential use would be difficult, if not impossible. An effort for three months to effect such a sale proved fruitless. For the board to reject the testimony of a broker so declaring was, in the court's judgment, inexcusably capricious. The recent residential sale across the street smacked of hearsay, and the buyer's

motive was not forthcoming. The second broker, incidentally, did not merely echo the statement of the first, as the board mistakenly declared; he said rather, as already mentioned, that the neighborhood trend was unequivocally commercial. A visual inspection clearly bears out that characterization. In the court's judgment, anyone who would buy a Cottman Avenue property in that area today for a residential use would be either naive or an individualist of the most stubborn type.

The protesting neighbors described the homes in the area as beautiful. The court is familiar with the area and considers such description exaggerated. The homes are indeed substantial and well preserved; but the record establishes there has been no residential construction there for some 35 years, and the age of existing residences is obvious. Furthermore, the manifest business drift of the locality inevitably derogates from their attractiveness as residences.

For the board to discard the uncontradicted testimony to the foregoing effect, the court feels, was completely arbitrary. For city council or the planning commission to close their eyes to the obvious facts is the act of a King Canute.

Peculiarly applicable here is the doctrine of Taylor v. Haverford Township, 299 Pa. 402 (1930). In Taylor, plaintiff owned a tract on a heavily traveled thoroughfare, near a business neighborhood, and lying in the path of further commercial development. Residential areas were nearby. Plaintiff's side of the highway was zoned residential, the opposite side was mostly commercial. The court found that the site was unsuitable for residential use, and had much more value for commercial purposes. On appeal, the Pennsylvania Supreme Court declared, at page 414:

"As a general rule, in zoning territory of the kind now before us, the lines should be fixed in such a way

as to avoid making one side of a main artery of travel purely residential where the opposite side of the street is already so uniformly used for business purposes as to have established its character in that regard (see White's App., 287 Pa. 259, 268) ; for so to do will almost inevitably lead to such unreasonable destruction of values as to be confiscatory".

So too, in the instant case, it would be confiscatory against the seller from whom plaintiff bought to restrict him to selling for a residential purpose, and thus, in effect, to deprive him completely of his right to sell.

The principle of Taylor has been reaffirmed by the Supreme Court in Taylor v. Moore, 303 Pa. 469 (1931), and followed by the Superior Court in DiBlasiis v. Bartell and Oliveto, 143 Pa. Superior Ct. 485 (1941). It also has served as a guiding rule for the lower courts of our State: Pasquino v. Keating, 3 Bucks 302 (1954) ; Martin v. Township of Haverford, 36 Del. Co. 155 (1948) ; Freeman v. Lansdowne Borough, 34 Del. Co. 449 (1946) ; Moyerman, Agent, v. Koons, 80 D. & C. 63 (Del. Co., 1952).

Furthermore, the influence of Taylor has spread beyond our State borders, the decision being cited and followed in Forbes v. Hubbard, 348 Ill. 166 (1932). That case involved an element existing in the instant case: the fact that the area behind the specific site is residential while the opposite side of the street is at least partly commercial. The Illinois court, in holding that the unequal zoning of different sides of a main artery produced a confiscatory effect, remarked at page 177: "It is clear from the undisputed evidence in this case that appellee's property is not characterized by the residence area lying west of it but rather by the business district which it faces".

The fact that adverse zoning effects a confiscation of a property is, of course, an economic result. We are

fully aware of the oft-cited rule that purely economic hardship will, of itself, not justify a zoning variance (Cresko Zoning Case, 400 Pa. 467 (1960) ), yet, five years after, the Supreme Court made it clear that the economic effect of a zoning regulation is a factor to be considered in determining its validity: National Land and Investment Company v. Easttown Township Board of Adjustment, 419 Pa. 504, 529 (1965). The United States Supreme Court in the Nectow case, supra, endorsed the same consideration. The circumstances in Nectow were much similar to those in the instant case. The plaintiff, Nectow, owned a tract, once occupied by a mansion house but then vacant, in a residential district, but bordered by industrial areas to the south and east. Nectow had sold the tract for $63,000, but when the buyer learned he could not use the tract except for residential purposes, he refused to consummate the purchase. A master found a residential use unpractical, but the lower court sustained the city's refusal to permit nonresidential construction. The Supreme Court, though upholding the general constitutionality of the zoning ordinance, ruled that its application to the specific case deprived the seller of the use of his property without due process of law.

Several Pennsylvania cases exhibit analogies to the instant case. In Gilfillan's Permit, 291 Pa. 358 (1927), the Supreme Court declared it improper to refuse a variance for construction of a warehouse on a lot in a residential zone where the general neighborhood was commercial. In Philadelphia Fairfax Corporation v. McLaughlin, 336 Pa. 342 (1939), where an apartment house owner opposed an open-air parking lot on the property of a nearby divinity school in a mixed residential and commercial area, the Supreme Court affirmed a variance, declaring: "The findings are completely substantiated by numerous instances

of commercial intrusions into the immediate vicinity of appellant's apartment house".

In Baranoff v. Zoning Board of Adjustment, 385 Pa. 110 (1956), where an owner of a tract in a district zoned for residential and farm use protested that its only feasible use was commercial, the Supreme Court reversed the denial of a variance and said, inter alia, at pages 117-19: "It remains taxable but yields no return to the owner who would be better off with outright confiscation of his property, . . . . Consequently the ordinance in its application to plaintiff's property is violative of the due process clause of the Fourteenth Amendment . . . and of Article I, Section I, of the Constitution of Pennsylvania in that it unlawfully deprives appellant of property without compensation".

As pointed out in National Land & Investment Company, supra, a municipality should not make a fetish of preserving the supposed "character" of a neighborhood, to the extent of virtually confiscating property lacking a ready market for the use sought to be preserved, where such preservation would block the natural development of an area. And in Pumo v. Norristown Borough, 404 Pa. 475 (1961), the Supreme Court evinced its approval of the extension of business areas, even into residential sections, along a main traffic artery, the phenomenon that has been called "ribbon commercial development".

It should be remembered that in zoning, a so-called "district" designated residential, or for that matter commercial, may be very small, and at times may comprise only a single tract. It is not uncommon to find one tract zoned residential and the adjoining lot zoned commercial. That is the situation in parts of the area under consideration in the instant case. Indeed, in the past, the board has granted a number of variances changing specific sites in the area from residential to commercial. While such prior variances do not neces-

sarily bind the board to similar action in the instant case, the court believes that consistency of action would be proper along a highway so clearly tending to commercial development as is Cottman Avenue.

In summary, in the instant case, the court finds a combination of the factors which underlay the various rulings hereinbefore cited:

1. An arbitrary deprivation, without compensation, of an owner's fundamental right to use his property as he sees fit, subject only to the rights of his neighbors.

2. Inconsistent zoning on opposite sides of a main traffic artery.

3. The willful disregard by the zoning board of commercial development in the immediate vicinity.

4. The Supreme Court's indicated approval of "ribbon commercial development"; the extension of commercial uses along main highways.

5. The value lacking for residential use but substantial for commercial purposes.

6. The virtual confiscation of property without compensation, in violation of the Federal and State Constitutions, that results when appropriate relief is not afforded.

In the court's judgment, the cumulative weight of these considerations, all supported by well-reasoned and cogent decisions, is overwhelming and demonstrates conclusively to an open-minded tribunal the arbitrariness of the board's action.

Hence, this court adjudges that the board's refusal of the permit sought in the instant case was a clear abuse of discretion and an error of law, which calls for reversal. The court has already entered an appropriate order to such effect, and such order is reaffirmed.